Brady, J.

INTRODUCTION

The plaintiff Subaru of New England, Inc., a distributor of Subaru motor vehicles, seeks a declaratory judgment that its approval of the relocation of a Subaru dealership from Salem to Danvers in 1996 complied with G.L.c. 93B. The defendant Subaru of Wakefield, Inc., a Subaru dealer, counterclaims for damages for violation of G.L.c. 93B, §4(3)(1), and G.L.c. 93B, §3. I heard evidence, jury-waived, over several days beginning on September 13, 1999 and concluding on September 22, 1999. At the request of the defendant, I viewed the locations of the defendant, Ira Subaru in Danvers, and the site of the former Gauthier Subaru dealership on Canal Street in Salem.

FINDINGS AND RULINGS

1. Subaru of New England, Inc. (SNE) entered into a dealership contract with defendant Subaru of Wake-field, Inc. (Wakefield) in 1991. (Exhibit 1.) Wakefield was refranchised in 1994 (Exhibit 3), in 1998 (Exhibit. 4). Wakefield is currently owned equally in one-third shares by Richard Kalika, Howard Belsky and Lawrence Belsky. Kalika is the president and general manager of the dealership; the other two owners do not participate actively in the business. From 1989 to 1991, another Subaru dealer operated from the same site at 888 East Main Street, Wakefield, a location a few miles east of Route 128.
2. Under the standard form dealership contract between SNE and its dealers, each dealer is assigned a so-called area of responsibility (AOR) within which the dealer assumes responsibility for the promotion, sales and service of Subaru products. The AOR’s are not necessarily exclusive; however, SNE tends to respect each dealer’s geographical prerogatives within its AOR.
3. Sometime in 1993, Wakefield, through Kalika, asked SNE to consider allowing it to relocate from Main Street in Wakefield to Route 1 in Danvers near the intersection of Route 114. There are numerous automobile dealerships located in the area along Route 114 between Route 128 and Route 95. It is a convenient location for consumers, and a generally desirable location for automobile dealerships. SNE did not have a dealership in that vicinity. However, Danvers was within the AOR of another Subaru dealership, Gauth-ier Subaru on Canal Street in Salem, MA. Mr. H.L. Burbank, SNE’s vice president of market development, told Kalika that SNE would consider it, but first he (Kalika) had to obtain the approval of Gauthier because Danvers was within Gauthier’s AOR. Kalika did not follow up.
4. Mr. Roland Gauthier owned several dealerships located on Canal Street in Salem, including a Subaru dealership. Canal Street is a generally poor area for dealerships, and in the mid-1990’s, Gauthier experienced declining sales. He lost Mercedes Benz and Saab franchises. Burbank tried to persuade Gauthier to relocate his Subaru dealership to Route 114, but he declined.
5. In 1995, primarily through contacts with SNE’s owner, Ernest Boch, Ira Rosenberg and his son David Rosenberg became interested in acquiring a Subaru dealership. Ira Rosenberg owns several automobile dealerships in the area of north of Boston on Route 114. The Rosenbergs wished to locate a Subaru dealership on Route 114 in the vicinity of their other dealerships. Because the location was within Gauthier’s AOR, Burbank told the Rosenbergs that they would have to obtain Gauthier’s consent.
6. Late in 1995, Mr. Gauthier’s financial problems became severe and he was unable to maintain so-called floor plan financing with a lender. He advised Burbank that he wished to sell his Subaru franchise and asked for SNE’s assistance (Exhibit 14). Burbank provided Gauthier with the necessary paperwork to request assistance from SNE. Because of Gauthier’s inability to maintain floor plan financing, SNE formally notified Gauthier that he was in default under his dealership agreement.
7. The Rosenbergs and Gauthier began to negotiate the possible sale of the Gauthier Subaru franchise. On May 1, 1996, they reached a basic agreement on the sale of the franchise to David Rosenberg, subject to SNE’s approval (Exhibit 21). On June 18, 1996, SNE granted conditional approval of David Rosenberg’s application to become a Subaru dealer in Salem (Exhibit 31).
8. On June 3, 1996, while SNE was considering the Rosenberg proposal, Kalika called Burbank to ask if the rumor that Ira Rosenberg was going to buy Gauth-ier and move it to Route 114 was true. Burbank confirmed that that was a proposal now under consideration. Mr. Kalika responded that he could not let that happen, and that he would protest. Mr. Burbank responded that he felt that the addition of a strong Subaru dealership on Route 114 in Danvers would *483 increase Wakefield’s sales, citing a similar recent situation where the placement of a Subaru dealership in Arlington, about seven miles from Wakefield, proved to have a positive effect on Wakefield’s sales.
9. Once Rosenberg and Gauthier reached a tentative agreement, Burbank updated a market study concerning the proposed relocation of the Gauthier franchise to Route 114 in Danvers (Exhibit 28). As the crow flies, Wakefield was about 8.9 miles from the Gauthier Salem franchise, and about 7 miles from the proposed Rosenberg relocation site on Route 114. Burbank’s market study concluded that Subaru market penetration in the Gauthier and Wakefield AOR’s, as well as in the adjacent Wilmington AOR, had been poor compared to market penetration in Massachusetts and in New England. Thus, for the 1995 calendar year, Subaru sales were 3.7% of the total competition in Massachusetts and 5.6% in New England. By comparison, the Subaru penetration in the Salem/Danvers AOR was 3.4%, the Wakefield AOR was 2.4%, and the Wilmington AOR was 2.3%. These numbers do not necessarily indicate that the dealers in these AOR’s were performing poorly, as dealers cam and do acquire sales from anywhere, but the data did indicate to Burbank that there was “considerable additional sales potential among these three AOR’s.” (Exhibit 28.)[1]
10. SNE was well aware of its obligations to existing dealers under G.L.c. 93B. That statute prohibits distributors such as SNE from “arbitrarily and without notice to existing franchisees” granting a franchise to an additional franchisee which would be conducting its dealership operations within the so-called relevant market area (RMA) of an existing franchise. G.L.c. 93B, §4(3)(1). The RMA is a defined term based on sales or service of the existing franchise. Based on the sales data regularly furnished SNE by Wakefield, Burbank knew that c. 93B would not apply to relocating the Salem dealership to Danvers. However, because the RMA is the smaller of the geographical areas defined by sales or service, he needed to obtain service data from Wakefield to complete his RMA analysis. He advised Kalika by letter dated June 19, 1996 (Exhibit 32) that SNE was willing to consider Wakefield’s own analysis of its RMA and asked Kalika to provide service data for such analysis by June 26, 1996. The possibility of a dealer protest under c. 93B was, of course, on the minds of the Rosenbergs and Gauthier in connection with their desired transaction. They were anxious to move, and Burbank was doing the best he could to resolve that issue and, if necessary, obtain a court judgment. SNE’s formal notice of its intent to appoint David Rosenberg as an authorized Subaru dealer was given in Burbank’s June 19, 1996 letter to Wakefield. The letter stated that SNE intended to appoint Rosenberg on August 23, 1996 and that Rosenberg intended to transfer the Subaru dealership from Salem to the Route 114/95 area in Danvers (Exhibit 32). Mr. Kalika responded by letter of June 26, 1996, a letter drafted by his counsel, protesting the proposed transaction and giving the required 30 days notice of his intent to file a petition in the Superior Court asking the court to enj oin the appointment for the Danvers location (Exhibit 33).
11. Wakefield did not provide the service data requested by Burbank. As Kalika conceded at his deposition, he did not want to give his opponent the “playbook” before the “game” (i.e. the expected lawsuit) began. Likewise, Kalika did not promptly respond to Burbank’s request to meet.
12. Meanwhile, in the winter and spring of 1996, Subaru of America, the manufacturer’s arm in the United States, was investigating the possibility of warranty fraud at Wakefield. Wakefield’s service manager, Larry Olynack, was found to have been submitting false warranty repair records for payment to Subaru of America. In May 1996 as a result of the audit, Subaru of America charged back approximately $91,000 to Wakefield. The audit did not purport to review each and every warranty record in the relevant time period, but rather a representative sample. The compromise figure does not reflect an accurate accounting of the precise number and dollar amounts of the fictitious invoices. Mr. Kalika himself was found to be unaware of the fraud. The responsible party, Olynack, was terminated.[2]
13. In mid July 1996, Kalika, Belsky and Scott Scimemi of Wakefield met with Mr. Boch, Burbank and other representatives of SNE to discuss the Rosenberg appointment and proposed move to Route 114. Mr. Burbank provided Wakefield’s representatives with a copy of his market study (Exhibit 28). The Wakefield representatives skimmed the report and had no substantive comments on it. According to Kalika, the meeting was set up to discuss the relocation; and the market study data was, to his way of thinking, irrelevant. The meeting became heated. It concluded with SNE’s representatives providing the Wakefield people with a courtesy copy of the complaint for declaratory judgment which SNE had filed on July 12, 1996 in this court.
14. Thereafter, the sale of Gauthier Subaru to David Rosenberg was completed. The new dealership first operated under the name of Ira Subaru in Salem. On November 27, 1996, after hearing, this court (Cowin, J.) denied Wakefield’s request for preliminary injunction. In January 1997, Ira Subaru moved to its present location on Route 114 near the intersection with Route 95.

Relevant Market Area

15. The first issue is whether the relocation of Ira Subaru from Salem to Danvers is an event which Wakefield has standing to protest under G.L.c. 93B, §4(3)(1). RMA is defined as the smaller of (1) the area *484 immediately surrounding the dealership from which the dealer has obtained at least two-thirds of its retail sales of new motor vehicles within the past three years, or (2) the area immediately surrounding the dealership from which it has obtained two-thirds of its retail service sales within the past three years.[3] For standing to exist, the relocation must have resulted in the introduction of an additional dealer into Wakefield’s RMA. Heritage Jeep Eagle, Inc. v. Chrysler Corporation, 39 Mass.App.Ct. 254, 258-60 (1995). In a nutshell, if the RMA contains both Danvers and Salem, defendant does not have standing to protest.
Wakefield concedes that using new car sales computed as of 1996 would not give it standing as both Danvers and Salem would be included in the RMA. The issue comes down to service sales.
Wakefield’s expert, Richard Brandwein, relying upon service data provided to him by Mr. Kalika, namely number of repair orders and dollar amount of repair orders from June 20, 1993 to June 19, 1996, has drawn an irregular line around several towns[4] contiguous to Wakefield which he opines is the RMA (Exhibit 75 and Exhibit H). Brandwein’s proposed RMA includes Danvers and excludes Salem. The location of the included service sales from which Brandw-ein drew his map of the RMA was based on the zip codes of the customers.
The statute includes in the RMA the area comprising two-thirds of the dealer’s “retail service sales.” The statute does not indicate whether the two-thirds should be computed on the basis of dollar volume or number of repair orders. Brandwein’s RMA includes 10,985 repair orders out of a total number of repair orders of 16,296 in the 3 year period, or 67.4%. The service sales by dollar value in Brandwein’s RMA comes to $2,504,586 out of total dollar value of $3,819,353, or 65.5%
I am not satisfied that Mr. Brandwein’s analysis produces the correct RMA under the statute. First, the underlying data is suspect. The service records for the relevant three-year time period are affected by Wakefield’s warranty fraud. One cannot determine to what extent Wakefield has included fictitious invoices. Kalika’s effort to exclude fictitious invoices on the basis of the $90,645.16 arrived at as the chargeback amount between him and Subaru of America is not a sufficient purge because the Subaru of America audit did not attempt to identify every single invoice which may have been fictitious. Only Olynack could do that, and he is not talking.
Second, Brandwein’s analysis is by zip code of the repair order. Analysis by zip code lacks the precision which another available method provides. A customer’s residence can be plotted by city block, and a line drawn around the area encompassing two-thirds by software known as Geographic Information Software. Mr. Brandwein chose not to use this method because he asserts it is expensive.
In any event, assuming the underlying repair order data to be correct, Brandwein’s exclusion of Salem from the RMA is entirely arbitrary. As defense counsel demonstrated during cross examination of Brandwein, a smaller area comprising two-thirds of the number of repair orders can be drawn on the map by excluding Andover (449),[5] North Andover (227), and Beverly (199), and including Salem (81), Swampscott (62), Nahant (8), East Boston (99), Chelsea (127), Charlestown (108), Somerville (311) and Cambridge (71). (See Exhibit P.) The included repair orders in this redrawn RMA would total 10,930 out of 16,296, or 67.07%. The statute requires the court to determine “the more narrowly defined and circumscribed geographical area immediately surrounding” Wakefield. The redrawn line better fits the statute.
An analysis of services sales by dollar amount likewise produces a RMA which includes Salem. Brandwein’s RMA only includes 65.5% of service sales by dollar amount. By including Salem (dollar amount $14,54.62) and East Boston ($27,754.52) in Brandwein’s RMA, the dollar volume percentage calculation becomes $2,546,865 out of $3,819,353, or 66.7%.
The conclusion is inescapable that Wakefield’s expert has drawn an RMA to exclude Salem only because it advantages his client. The correct RMA under the statute, whether drawn based on number of repair orders or dollar amount, includes Salem and Danvers. Relocation of a dealer within a RMA does not give another dealer the right to invoke c. 93B. Wakefield does not have standing to protest the relocation.

Arbitrariness

[6]

16. Even assuming that Wakefield had standing to protest, I must conclude that SNE’s approval of the relocation was not arbitrary. “Arbitrary” under G.L.c. 93B, §4(3)( 1) means something different than it means in ordinary discoúrse and in most legal contexts. “In its c. 93B sense . . . ‘arbitrary’ is a term of art that connotes that a new dealership will impinge economically on an existing dealership.” Richard Lundgren, Inc. v. American Honda Motor Co., Inc., 45 Mass.App.Ct. 410, 412 (1998). In determining whether a new dealership “will impinge economically” on the existing dealership, the court must consider a list of eight non-exhaustive factors set out by the statute.
1. Whether the establishment of such additional franchise appeared to be warranted by economic and marketing conditions including anticipated future changes.
Subaru sales have been on the upswing since 1991. Notwithstanding the general increase in Subaru business, the dealerships’ penetration north of Boston for 1994, 1995, and one-half of 1996 was less than penetration in Massachusetts and in the New England region. As Mr. Burbank saw it in his market analysis *485 (Exhibit 28), there was room for additional business north of Boston in mid-1996.
The Rosenbergs were known to be aggressive promoters. SNE’s past experience with the establishing of a Subaru dealership in Arlington, about seven miles from Wakefield, showed that the presence of in-trabrand competition is not necessarily harmful, but can increase business for all due to heavier promotion and visibility of the product. Wakefield’s sales increased following the establishment of Cityside Subaru in Arlington.
The relocation of Ira Subaru to Danvers was warranted by economic and marketing conditions, including anticipated future changes.
2. The retail sales and service business transacted by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee during the three year period immediately preceding such notice as compared to the business available to them.
Wakefield’s sales increased from 1992 to 1996. It was and is a successful dealership. However, Wakefield’s AOR as well as the AOR’s in the Sálem/Danvers area and the abutting Wilmington area, consistently lagged the state and New England average penetration. The use of AOR’s as an analytical tool to ascertain “lost opportunity” is a generally accepted practice in the automobile industry. It was appropriate for Mr. Burbank to use this mode of analysis in evaluating the factors listed by G.L.c. 93B. Furthermore, in the fall of 1996, to confirm Burbank’s analysis, SNE hired Urban Science Applications, Inc., a firm engaged in the business of doing marketing analysis for the motor vehicle industry, to do a similar market study. Mr. Frith’s analysis, more detailed than Mr. Burbank’s, likewise concluded that there was general underperformance by Subaru in the area north of Boston, and that there were substantial opportunities to sell more Subarus in the area. I credit Mr. Frith’s testimony. I find that his study was thoroughly done and his conclusions carefully arrived at. There was more business available to Subaru in the contested area. One reason for under performance was the poor location of Gauthier Subaru.
3. The investment necessarily made and obligations incurred by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee to perform their obligations under existing franchises or selling agreements.
Mr. Kalika and his partners purchased Wakefield in January 1991 for approximately $250,000.00. Wake-field leases its facility for a period of years at a present rental of approximately $9,700 per month. Its main manner of financing is a floor plan loan with the Marine Midland Bank, presently with a balance of approximately $3.2 million, guaranteed by the shareholders.
4.The permanency of the investment of the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee.
Mr. Kalika works full time in the business. The other two partners are passive investors. They have no immediate plans to sell the dealership. A few relatives are employed in the business.

5.Whether it is beneficial or injurious to the public welfare for an additional franchise to be established.

The public interest is served by a conveniently located dealer who competitively prices its vehicles. It is better for the consuming public to have Ira Subaru located on Route 114 in Danvers than on Canal Street in Salem.
6. Whether the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee are providing adequate competition and convenient consumer care for the motor vehicles of the same line make owned or operated by residents and persons with places of business in the area to be served by the additional franchisee.
Wakefield was providing adequate competition and convenient consumer care, but Gauthier was operating from an inconvenient location and in an antiquated facility. The relocation of that dealership from Salem to Danvers enhances competition and makes consumer care more convenient.
7. Whether the objecting motor vehicle dealer or dealers or other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee have adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the consumer.
Wakefield does have adequate sales and service facilities, equipment, vehicle parts and qualified personnel to provide for the needs of the customer. The same cannot be said for the Salem location.
8. Whether the establishment of an additional franchise would increase competition and, therefore, be in the public interest.
The relocation of Ira from Salem to Danvers was good for the public and good for the defendant.
*486 17. Because this case did not proceed to trial with the dispatch contemplated by the statute, the court has evidence of what actually happened after the event of relocation. When the parties appeared before the court in November 1996 for hearing on defendant’s motion to enjoin the relocation, Wakefield argued that to allow a competitor such as Ira to move to Route 114 would likely put it out of business within two years. SNE argued in opposition that Ira’s presence would likely enhance defendant’s business. Events in the last 21/2 years have proven that SNE was correct and Wakefield was wrong. By all relevant financial measures, Wakefield has been very successful since the Ira move. Its sales growth for the two year period following the move, as compared to the two year period prior to the move, was 33.68%, as compared to sales growth of Subarus in Massachusetts of 26.64% and Subarus in New England of 19.62% (Exhibit E). Wakefield’s new vehicle unit sales substantially increased after the relocation. Likewise, Wakefield’s gross revenue on new vehicle sales substantially increased after the move.
Wakefield’s argument now is that it would have sold even more vehicles had Ira not relocated; in other words, that they should have had all of the increased pie, not just part of it. I do not accept this argument. It ignores the fact that Ira’s presence was a substantial reason for the sales increase.
Wakefield further argues that even though it has been successful since the Ira move, it is likely to be in substantial jeopardy when and if the market turns and sales decline. While it is inevitable that sales over time will ebb and flow, it is mere speculation to say that Wakefield’s existence will be jeopardized. Like any business, Wakefield must be prepared for market downturns; but that line of argument provides no basis to rule that SNE violated c. 93B, or acted unfairly or arbitrarily.

ORDER

A judgment shall enter declaring that Wakefield lacks standing to object to the relocation of Ira Subaru to Danvers because the relocation does not constitute the appointment by SNE of an additional franchisee within the meaning of G.L.c. 93B. Even if Wakefield does have standing to object, the relocation was lawful, proper, not arbitrary and otherwise in compliance with the provisions of G.L.c. 93B. Judgment shall enter for the plaintiff on Counts I and n of the counterclaims. Such costs as are allowed by law are awarded to the plaintiff.

Burbank’s market study was detailed and thorough. Although not necessarily of the view that G.L.c. 93B applied to the situation, he carefully analyzed the relocation under the criteria of G.L.c. 93B, §4(3)(1).

Notwithstanding the fraud, Olynack was later rehired. Counsel advises that he claims his Fifth Amendment privilege and refuses to answer questions concerning alleged fictitious warranty records.

The 3-year period is that period prior to SNE's notice of intent to appoint Ira Subaru, namely June 20, 1993 to June 19, 1996.

The cities and towns encompassed within the irregular line drawn by Brandwein are Andover, North Andover, Wilmington, North Reading, Middleton, Danvers, Beverly, Peabody Lynnfield, Reading, Burlington, Woburn, Winchester, Stoneham, Wakefield, Lynn, Saugus, Melrose, Arlington, Medford, Malden, Everett and Revere. (Exhibit H.)

Number of repair orders in parenthesis.

Defendant’s counterclaim is in two counts. Count I is for violation of G.L.c. 93B, §4(3)(1), and Count II is for violation of G.L.c. 93B, §3. I do not regard Count II as pleading a separate cause of action because the unfair methods of competition and unfair or deceptive acts or practices are defined in §4. There is no "generalized unfairness” cause of action under c. 93B. In any event, I find that nothing which plaintiff did or failed to do in connection with the relocation issue which was unfair or deceptive.